**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NATHANIEL T., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  1:25CV631 |
| | ) |
| FRANK J. BISIGNANO, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant.[1] | ) |

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Nathaniel T., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB").  (Docket Entry 1.)  The Commissioner has filed the certified administrative record (Docket Entry 2 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 7 (Plaintiff's Brief); Docket Entry 8 (Commissioner's Brief);

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute as Defendant in this suit. Neither the Court nor the parties need take further action to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Docket Entry 9 (Plaintiff's Reply)).  For the reasons that follow, the Court should enter judgment for the Commissioner.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 195-203), alleging a disability onset date of October 15, 2022 (see Tr. 197).  Upon denial of that application initially (Tr. 70-79, 91-95) and on reconsideration (Tr. 80-90, 103-06), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 107).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 32-69.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 11-31.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 191-92, 339-44), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] last met the insured status requirements of the . . . Act on March 31, 2024.

2.    [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of October 15, 2022 through his date last insured of March 31, 2024.

3.    Through the date last insured, [Plaintiff] had the following severe impairments: osteoarthritis of the bilateral knees; depressive disorder; anxiety disorder; intellectual delay; and attention deficit hyperactivity disorder (ADHD).

. . .

2

4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform medium work . . . except he can engage in frequent climbing, stooping, kneeling, crouching, and crawling; [he] can have frequent exposure to high, exposed places; he can do work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, and for which little specific vocational preparation and judgment are needed; [he] can do work requiring sustained concentration and persistence for no greater than approximately 2 hours at a time; he can do work that is not frequently performed on an assembly line or at a similar production[]pace; [he] can adapt to occasional changes to the work setting and the manner and method of performing the assigned work; he can do work that frequently provides for two 15-minute breaks and one 30-minute break for each 8-hour shift worked, occurring at such times as directed by the employer; and [he] can have occasional interactions with supervisors and coworkers, with only superficial and incidental interactions with the general public, further defined as no more than approximately 1 hour during the workday, with no more than about 10 minutes occurring during any one sustained period of time.

. . .

6. Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

. . .

3

> 11. [Plaintiff] was not under a disability, as defined
> in the . . . Act, at any time from October 15, 2022, the
> alleged onset date, through March 31, 2024, the date last
> insured.

(Tr. 16-27 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting

Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]."  Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)."  Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

5

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignment of Error

Plaintiff's first and only assignment of error maintains that "[t]he hearing decision's [RFC] assessment does not address well-documented evidence that [Plaintiff]'s ability to read, write, and do math calculations is limited to the 2nd grade level." (Docket Entry 7 at 2 (bold font and block formatting omitted); see also Docket Entry 9 at 1-3.) In particular, Plaintiff notes that "[t]he ALJ cited [Plaintiff]'s testimony that he has an 11th grade

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

education (Tr. 24) and found that he 'has a limited education' (Tr. 26)" (Docket Entry 7 at 3 (spaces added)), which the regulations define as "'a 7th grade through the 11th grade level'" (id. (quoting 20 C.F.R. § 404.1564(b)(1))). Plaintiff points out that the regulations "recognize[] that the numerical grade level a claimant has completed 'may not represent [his] actual educational abilities' because those abilities 'may be higher or lower' than the completed grade level," as well as that "the numerical grade level a claimant has completed will be used to determine his educational level only 'if there is no other evidence to contradict it.'" (Id. at 3-4 (quoting 20 C.F.R. § 404.1564(b)).) According to Plaintiff, "[t]here is ample evidence in the record that[,] despite completing the 11th grade, [Plaintiff] does not possess 11th grade-level abilities" (id. at 4), such as "[t]he Individualized Education Program (IEP) for his 6th grade school year [which] documents that he was classified as Specific Learning Disabled in the area of basic reading" (id. (citing Tr. 329)) and "was only able to read independently at 'a 2.5-3.0 Grade Level'" (id. (quoting Tr. 330)), his "high school transcript [which] documents that his grade point average at the end of 11th grade was only 1.5133 and his class rank was 198 out of 205 students" (id. (citing Tr. 326)), his "testi[mony] that he has difficulty reading" (id. (citing Tr. 45, 51-52)), and "[h]is [Wide Range Achievement Test-V ('WRAT-V')] scores [which] indicate grade 2.8 equivalent

9

word reading ability, grade 2.9 equivalent spelling ability, grade 2.3 equivalent math computation ability, and grade 2.9 equivalent sentence comprehension ability" (id. at 5 (citing Tr. 694)).  In that regard, Plaintiff observes that "[t]he ALJ . . . did not discount [Plaintiff]'s WRAT-V . . . scores[,] . . . question the accuracy of the WRAT-V scores[,] or offer any reason to dispute the[ir] accuracy."  (Id. at 6.)

Plaintiff additionally contends that the ALJ's above-described errors qualify as "significant because . . . the [ALJ] must consider the vocational factor of [Plaintiff]'s education when evaluating his ability to do other work at step five of [the SEP]" (id. at 6-7), "[b]ut the ALJ did not identify the specific educational level of [Plaintiff]" in his dispositive hypothetical question to the VE (id. at 7 (citing Tr. 64)), and, thus, "[t]he VE could not have known what educational level she was being asked to consider" (id.; see also id. at 8 (citing Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989), for proposition that, "'[i]n order for a [VE]'s opinion to be relevant or helpful, . . . it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments'" (citation omitted), and Britt v. Saul, 860 F. App'x 256, 263 (4th Cir. 2021), as case holding "that an ALJ's hypothetical to a VE must 'give the claimant's age, education, experience, and [RFC]'"")).  Plaintiff further asserts that the VE testified that the jobs she cited in response to the

10

ALJ's dispositive hypothetical question would not remain available for an individual with "an ability to read, spell, and do math calculations at no greater than the 2nd grade level, as indicated by [Plaintiff]'s WRAT-V scores" (id. at 8 (citing Tr. 65-66)), and "[t]he ALJ did not state any reason to discount th[at ] testimony" (id. at 9 (citing Tr. 27)).  Plaintiff thus argues that "[t]he actual level of [Plaintiff]'s academic abilities is [] material to the step-five determination of whether he can perform other work[,]" and "[t]he Court should therefore remand this case to the [SSA] for further evaluation of th[at] material and dispositive issue." (Id.)  For the reasons that follow, those contentions lack merit.

The regulations define "[e]ducation" as "formal schooling or other training which contributes to [a claimant's] ability to meet vocational requirements, [such as] reasoning ability, communication skills, and arithmetical ability."  20 C.F.R. § 404.1564(a).  Those regulations further define the levels of education relevant to the instant matter as follows:

> . . . Illiteracy means the inability to read or write. [The SSA] consider[s] someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling.
>
> . . . Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  [The SSA] generally

11

consider[s] that <u>formal schooling at a 6th grade level or less</u> is a marginal education.

. . . <u>Limited education</u> means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. [The SSA] generally consider[s] that a <u>7th grade through the 11th grade level of formal education</u> is a limited education.

20 C.F.R. § 404.1564(b) (emphasis added). Those regulatory provisions also expressly acknowledge that "the numerical grade level that [a claimant] completed in school may not represent [his or her] actual educational abilities," and, thus, the SSA "will use [a claimant's] numerical grade level to determine [his or her] educational abilities" <u>only</u> "if there is <u>no other evidence to contradict it</u>." <u>Id.</u> (emphasis added). An ALJ may consider a claimant's "[p]ast work experience and the kinds of responsibilities [a claimant] had [while] working, . . . daily activities, hobbies, or the results of testing" in determining a claimant's educational level. 20 C.F.R. § 404.1564(a); <u>see also</u> Social Security Ruling 20-01p, <u>How We Determine an Individual's Education Category</u>, 2020 WL 1285114, at *2 (Mar. 9, 2020) ("SSR 20-01p").

Here, the ALJ determined that "[Plaintiff] ha[d] a limited education" (Tr. 26) and, although the ALJ did not <u>expressly</u> explain the rationale behind his "limited education" finding (<u>see</u> Tr. 20-25), the Court can nevertheless meaningfully review the ALJ's

12

reasoning supporting that finding. As discussed more fully below, the ALJ's decision makes clear that he did not rely <u>solely</u> on Plaintiff's completion of the 11th grade to find that Plaintiff had a "limited education" (Tr. 26), but also considered Plaintiff's testimony and subjective statements, academic record, daily activities, objective findings on mental status examinations, and the opinion evidence (<u>see</u> Tr. 21-25).

To begin, at step two of the SEP, the ALJ found that Plaintiff's "intellectual delay" qualified as a severe impairment (Tr. 16), and then, in discussing the RFC, expressly acknowledged Plaintiff's testimony that "it is hard for him to comprehend things when he reads," "he had an IEP in high school, but he was not in special education," "[h]e had trouble with reading assignments then, and he does not read well now as his comprehension is poor," "he needed his wife's help to read and understand notices from [the SSA]," [h]is ability to read newspaper articles is very limited because [he] cannot comprehend multiple sentences or paragraphs," and "[t]his has caused issues with past jobs when he needed help reading service orders." (Tr. 21 (referencing Tr. 45, 50-52).)[6]

---

[6] Notably, when questioned by the ALJ about his ADHD, the following exchange occurred:

| [PLAINTIFF:] | I have a hard time focusing on anything, and it's [] hard for me to like comprehend things like when I'm trying to read or – |
| [ALJ:] | You have to focus in on what you're reading? <u>Because you're able to read, correct</u>? |
| [PLAINTIFF:] | <u>Yes, sir</u>. |

13

However, the ALJ thereafter found "[Plaintiff]'s statements concerning the intensity, persistence and limiting effects of [his] symptoms [] <u>not entirely consistent</u> with the medical evidence and other evidence in the record" (Tr. 22 (emphasis added)), a finding unchallenged by Plaintiff (<u>see</u> Docket Entries 7, 9).

Beyond the ALJ's above-quoted finding that he did not find Plaintiff's subjective symptom reports entirely consistent with the record (<u>see</u> Tr. 22), the ALJ discussed evidence relating to Plaintiff's intellectual abilities in the ALJ's evaluation of consultative psychological examiner Rebecca J. Kincaid, M.S.'s opinions, as follows:

---

[ALJ:]         But <u>it's just the focusing part of reading that you have trouble with</u>?
[PLAINTIFF:]   <u>Yes, sir</u>.

(Tr. 45 (emphasis added).)  Plaintiff's representation to the ALJ that Plaintiff could read but struggled with <u>focusing</u> while reading harmonizes with the materials he submitted in support of his application for DIB, which listed "ADD" and "anxiety" as disabling impairments, but not difficulty reading or comprehending (Tr. 239), and which stated that he "c[ould] read and understand English" and "write more than [his] name in English" (Tr. 238; <u>see also</u> Tr. 236 (Disability Report - Field Office noting Plaintiff displayed no difficulties with reading, understanding, coherence, concentration, talking, and answering), 254-55, 261 (Function Report completed by Plaintiff's wife indicating that Plaintiff could not focus or stay on task, got overwhelmed easily, had a hard time holding a job due to lack of focus, and forgot things very easily, but not including difficulty reading or comprehending as limitation affecting ability to work), 262 (Plaintiff's Function Report stating that his lack of focus on tasks prevented him from working, but not listing difficulties in reading or comprehension), 286-87 (Plaintiff's Function Report completed by his wife reflecting that lack of focus and concentration on tasks and anxiety kept Plaintiff from working, but not any trouble with reading or comprehension)).  <u>See</u> <u>Joines v. Colvin</u>, No. 3:14CV396, 2015 WL 1249579, at *9-10 (W.D.N.C. Mar. 18, 2015) (unpublished) (affirming ALJ's finding that the plaintiff had "limited education," where "[the p]laintiff [] stated in a Disability Report that he can read and understand English and write more than his name in English[,]" despite testifying to the contrary (internal quotation marks omitted)).

14

Rebecca Kincaid, M.S. (supervised by Tom Keane, Ph.D.) evaluated [Plaintiff] in a psychological consultative exam on September 20, 2023. [Plaintiff]'s posture and gait on exam were compromised because he did not stand up straight. Ms. Kincaid noted that he appeared anxious and in pain. However, he was well groomed, and [he] was very cooperative. [Plaintiff] endorsed a wide range of mental symptoms. He stated that he was diagnosed with ADHD as a child. [Plaintiff] had an abusive childhood, he had always been extremely anxious, he was unhappy and he had low self-esteem. He reported being easily distracted and feeling worthless. [Plaintiff] also endorsed difficulties in concentration. He stated that he liked to stay to himself and he could not complete tasks timely. However, [Plaintiff] denied needed [sic] constant provision and guidance, and he denied mood fluctuations. Ms. Kincaid observed that [Plaintiff] was very anxious on exam but polite. He could follow simple directions, his thoughts were organized and his speech was clear. There were no articulation difficulties. [Plaintiff] was oriented, and he was not fidgety or hyperactive. However, response time was slower than average and [Plaintiff] worked at a slower than average speed. Ms. Kincaid assessed a full-scale IQ of 56 after administering a [Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV")] exam. A verbal comprehension subtest was borderline, and a perceptual reasoning subtest was low average. Achievement test scores were extremely low, and Vineland Adaptive Behavioral Scale was low range. [Ms. Kinkaid] diagnosed anxiety disorder, depressive disorder and mild intellectual disability. She opined that [Plaintiff] had moderate impairments in social, cognitive and emotional functions that could be prohibitive in a typical or traditional work environment. He could minimally understand, retain and follow instructions, but [he] was emotional and had difficulties with comprehension. Ms. Kincaid also opined that [Plaintiff] was seemingly not able to tolerate the stress and pressure associated with daily work. Her opinion is generally unpersuasive because it overstates [Plaintiff]'s limitations based on the overall weight of evidence, which supports a limitation to unskilled work activities. [Plaintiff] reported through his wife on November 28, 2023 that he follows spoken instructions better. [Consultative medical examiner] Dr. [Stephen] Burgess noted normal cognition. [Plaintiff]'s recent and remote memory were

15

> good, and intellectual functioning appeared normal. [Plaintiff's wife] stated on June 19, 2023 that [Plaintiff] has no problems with personal care. He drives, and he can do all basic financial tasks. Dr. Burgess noted that [Plaintiff] manages his own dressing and hygiene. Furthermore, [Plaintiff] picks up his children at school.
>
> As stated previously, Ms. Kincaid assessed a full-scale IQ of 56, which suggests significant cognitive limitations. However, [Plaintiff]'s educational record and daily routine shows intact intellectual functioning. He testified that he has an eleventh grade education, and that he was not enrolled in special education. [Plaintiff] was able to obtain a driver's license without any restrictions. He also reported some limitations writing, but [he] can read.

(Tr. 23-24 (emphasis added) (internal parenthetical citations omitted).)[7]

The ALJ then crafted an RFC containing substantial mental limitations, including, inter alia, "work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, . . . work that is not frequently performed on an assembly line or at a similar production[]pace[,]" "occasional changes to the work setting and the manner and method of performing the assigned work[,]" "occasional interactions with supervisors and coworkers," and "only

---

[7] Although the ALJ noted that "Ms. Kinkaid assessed a full scale IQ of 56 after administering a WAIS-IV exam" (Tr. 24 (emphasis added)), Ms. Kinkaid's reference to a "Full Scale IQ" of "56" in the column listing Plaintiff's scores (Tr. 693 (emphasis added)) appears to constitute a typographical error, as Ms. Kinkaid had earlier described the results of Plaintiff's WAIS-IV test as reflecting "a Full Scale IQ of 66," which placed him "in the intellectually deficient range of cognitive functioning" (Tr. 693 (emphasis added); see also Tr. 694 (again representing Plaintiff's WAIS-IV "Full Scale IQ" score as "66 in the extremely low range of cognitive functioning" (emphasis added))).

16

superficial and incidental interactions with the general public."
(Tr. 20.) Subsequently, at step five of the SEP, the ALJ adopted
the VE's testimony that an individual with Plaintiff's age,
education, work experience, and RFC could perform the unskilled
jobs of floor waxer, coffee maker, and counter supply worker (see
Tr. 26-27; see also Tr. 63-64). See Dictionary of Occupational
Titles ("DOT"), No. 381.687-034 ("Waxer, Floor"), 1991 WL 673262
(G.P.O. 4th ed. rev. 1991); DOT, No. 317.684-010 ("Coffee Maker"),
1991 WL 672750; DOT, No. 319.687-010 ("Counter-Supply Worker"),
1991 WL 672772.

Notwithstanding the above-detailed substantial evidence
supporting the ALJ's "limited education" finding (Tr. 26),
Plaintiff attacks that finding on multiple fronts, none of which
carries the day. At the outset, Plaintiff's assertion that "ample
evidence [exists] in the record that . . . [Plaintiff] does not
possess 11th grade abilities" (Docket Entry 7 at 4; see also id. at
4-5 (detailing such evidence (citing Tr. 45, 51-52, 326, 329-30,
694))) misinterprets this Court's standard of review. The ALJ
discussed all of the evidence Plaintiff cites (see Tr. 21-25) and,
although Plaintiff urges the Court to weigh that evidence
differently than the ALJ, the Court cannot re-weigh evidence but,
rather, must determine whether the ALJ's finding meets the modest
standard for substantial evidence, see Biestek v. Berryhill, 587
U.S. 97, 103 (2019) ("[T]he threshold for such evidentiary

17

sufficiency is not high"); see also Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence."); Joines v. Colvin, No. 3:14CV396, 2015 WL 1249579, at *10 (W.D.N.C. Mar. 18, 2015) (unpublished) ("[I]t is not the province of th[e] court to reweigh the evidence before the Commissioner, but instead only to ensure application of the correct legal standards and that the Commissioner's decision is supported by substantial evidence.").[8]

Next, Plaintiff faults the ALJ for failing to "discount [Plaintiff]'s WRAT-V . . . scores[,] . . . question the accuracy of the WRAT-V scores[,] or offer any reason to dispute the[ir] accuracy." (Docket Entry 7 at 6 (referencing Tr. 694).) That argument glosses over the fact that the ALJ did find Ms. Kincaid's opinions "generally unpersuasive" as "overstat[ing Plaintiff]'s limitations based on the overall weight of evidence, which supports a limitation to unskilled work activities" (Tr. 24 (emphasis

---

[8] As the Commissioner notes (see Docket Entry 8 at 6), Plaintiff does not indicate which (presumably lower) educational level the ALJ should have found Plaintiff to have, i.e., marginal or illiterate, and has certainly made no attempt to argue that he qualified for "[i]lliteracy," i.e., "inability to read or write[,]" 20 C.F.R. § 404.1564(b)(1). (See Docket Entries 7, 9.) Moreover, the above-quoted evidence of Plaintiff's intellectual and adaptive functioning discussed by the ALJ (see Tr. 23-24) forecloses any such argument.

18

added)), which would include Ms. Kincaid's findings that Plaintiff's low scores on the WRAT-V placed him between the 2nd and 3rd grade level in reading, spelling, and math (see Tr. 694). As quoted above, the ALJ gave multiple reasons for finding Ms. Kincaid's opinions "generally unpersuasive." (Tr. 24.)

Moreover, even if, arguendo, the ALJ should have found that Plaintiff had a "[m]arginal education," i.e., "a 6th grade level or less[,]" 20 C.F.R. § 404.1564(b)(2), Plaintiff has not shown that such an error prejudiced him. As quoted above, the regulations define "[m]arginal education" as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." Id. (emphasis added). Here, the ALJ adopted VE's testimony that Plaintiff could perform the unskilled jobs of floor waxer, coffee maker, and counter supply worker (see Tr. 26-27; see also Tr. 64), and Plaintiff has not argued that he lacked the intellectual capacity to perform the simple duties involved in performing those jobs (see Docket Entries 7, 9). See DOT, No. 381.687-034 ("Waxer, Floor"), 1991 WL 673262 (setting forth that floor waxer "[c]leans, waxes, and polishes floors by hand or machine[,]" which involves "[r]emov[ing] dirt and blemishes from floor, using various cleaning solvents and compounds," "[a]ppl[ying] paste or liquid wax to floor with rags or machine[,]" and "[p]olish[ing] floor with electric polishing machine or weighted brush"); DOT, No. 317.684-010 ("Coffee Maker"), 1991 WL

19

672750 (providing that coffee maker "[b]rews coffee, tea, and chocolate, using coffee urns, drip or vacuum coffee makers, teapots, drink mixers, and other kitchen equipment"); DOT, No. 319.687-010 ("Counter-Supply Worker"), 1991 WL 672772 (describing duties of counter supply worker as "[r]eplensh[ing] food and equipment at steamtables and serving counters of cafeteria to facilitate service to patrons[,]" which entails "[c]arr[ying] food, dishes, trays, and silverware from kitchen and supply departments to serving counters[,]" "[g]arnish[ing] foods and position[ing] them on table to ensure their visibility to patrons and convenience in serving[,]" and "[k]eep[ing] assigned area and equipment free of spilled foods").[9]

Lastly, Plaintiff has not shown that the ALJ's reliance on the VE's testimony violated Walker and Britt. Although the ALJ asked the VE to consider a "hypothetical individual [with Plaintiff]'s age, education and work experience" (Tr. 64 (emphasis added)), and did not specify that Plaintiff had a "limited education" (see id.), the VE swore under oath at the hearing that she "read the materials pertaining to [Plaintiff] that were made available to her prior to

---

[9] Notably, the DOT rates all three jobs as requiring Language Development Level 1 ("LDL 1")and Mathematical Development Level 1 ("MDL 1"), see DOT, No. 381.687-034 ("Waxer, Floor"), 1991 WL 673262; DOT, No. 317.684-010 ("Coffee Maker"), 1991 WL 672750; DOT, No. 319.687-010 ("Counter-Supply Worker"), 1991 WL 672772, which represent the least intellectually demanding levels of Language Development and Mathematical Development of six levels, see DOT, App'x C ("Components of the Definition Trailer"), § III ("GENERAL EDUCATIONAL DEVELOPMENT (GED)"), 1991 WL 688702.

20

the hearing" (Tr. 62), and Plaintiff neither showed that the materials the VE read lacked Plaintiff's work history and educational records (see Docket Entries 7, 9), nor (through his counsel) questioned the VE about the materials she reviewed in preparation for the hearing (see Tr. 65-67). Moreover, the VE also swore that she "listened to [Plaintiff's] testimony th[at] morning during the hearing" (Tr. 62) and, thus, the VE heard Plaintiff's testimony that, although he completed 11th grade (see Tr. 37-38), he needed an IEP in middle and high school (but remained in regular classes) (see Tr. 50), struggled to understand some of the materials he read (see Tr. 50-51), needed his wife to help him read certain materials (see Tr. 51) and, in a prior job, asked coworkers to read work orders for him (see Tr. 52). Significantly, after hearing the ALJ's dispositive hypothetical question omitting the term "limited education," Plaintiff (through his counsel) failed to question the VE on cross-examination about the impact of either a "limited education" or a "marginal education" on the available jobs (see Tr. 65-67). Under such circumstances, Plaintiff has failed to demonstrate that the VE lacked sufficient knowledge of Plaintiff's educational background to offer an informed opinion regarding the available jobs he could perform.

In light of the foregoing analysis, Plaintiff has not shown that the ALJ failed to properly evaluate Plaintiff's education level, and, thus, Plaintiff's sole assignment of error falls short.

21

## III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 20, 2026

22